

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**FILED**

MAY 1 5 2013

CLIFFORD J. PROUD
U.S. MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE MATTER OF THE SEARCH OF:

A RESIDENCE LOCATED AT 309 NORTH
38TH STREET, ST. CLAIR COUNTY,
BELLEVILLE, ILLINOIS, DESCRIBED AS
A SINGLE FAMILY, ONE AND A HALF
STORY RESIDENCE WITH TAN SIDING
AND COVERED FRONT PORCH WITH
THE NUMBER 309 LOCATED ON A
FRONT PORCH STEP OF THE RESIDENCE

Case No. 13-M-6018-CJP

**Filed Under Seal**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

I, Julie E. Neiger, being first duly sworn, hereby depose and state as follows:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe

that on the person or on the premises known as:

A RESIDENCE LOCATED AT 309 NORTH 38TH STREET, ST. CLAIR
COUNTY, BELLEVILLE, ILLINOIS, DESCRIBED AS A SINGLE FAMILY,
ONE AND A HALF STORY RESIDENCE WITH TAN SIDING AND
COVERED FRONT PORCH WITH THE NUMBER 309 LOCATED ON A
FRONT PORCH STEP OF THE RESIDENCE

in the Southern District of Illinois, there is now concealed a certain person or property, namely:

### SEE ATTACHED LIST, "ATTACHMENT A"

which constitutes evidence of the commission of a criminal offense, or which is contraband, the

fruits of crime, or things otherwise criminally possessed, or which is designed or intended for

use, or which is or has been used as the means of committing an offense in violation of 21 U.S.C.

§§ 841, 844, 846, and 856.

### AFFIDAVIT

The facts to support the issuance of a Search Warrant are as follows:

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for the past 10 years.  As such, I am vested with the authority to investigate violations of federal laws, including Titles 18 and 21 of the United States Code.  I am currently assigned to the Springfield Division of the FBI, Fairview Heights, Illinois Resident Agency, and have primary investigative responsibilities for crimes occurring within the Southern District of Illinois.

2.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, Confidential Sources (referred to as CS's), and Sources of Information (referred to as SOI's). This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      This Affidavit is made in support of a warrant to search for and seize evidence of violations 21 U.S.C. §§ 841, 844, 846, and 856, specifically those items set forth in Attachment A of this Affidavit, from the residence of Sean D. McGilvery, located at 309 North 38th Street, St. Clair County, Belleville, Illinois, described as a single family, one and a half story residence with tan siding and covered front porch with the number 309 painted on a front porch step of the residence, in the Southern District of Illinois.

### INVESTIGATION

4.      On July 29, 2011, Justin D. Cahill (a 36 year old white male) was interviewed pursuant to a proffer agreement in the presence of his attorney.  Cahill pled guilty to a charge of Conspiracy to Distribute a Controlled Substance.  Cahill told your Affiant that an individual, known to Cahill as Mike "Buck" Reamer, obtained OxyContin pills from Cahill and would then give the pills to Michael N. Cook, a St. Clair County Circuit Court Judge.  Reamer told Cahill

2

that Reamer arranged for Cahill's fourth criminal case for Driving Under the Influence (DUI) to be assigned to Judge Cook.   During the pending judicial proceedings, Judge Cook would shuffle Cahill's paperwork to the bottom of the stack.   Cahill believed that by supplying more OxyContin pills to Reamer for Judge Cook, Cahill received less jail time for his felony DUIs. For example, Cahill believed his third DUI case which was assigned to Judge Cook, was continued multiple times and took nearly four years to resolve, with Cahill ultimately receiving a sentence of only three months incarceration.

5.      Cahill went on to state he supplied cocaine and/or OxyContin pills to James K. Fogarty, a St. Clair County Probation Officer and an unlawful drug user.   From May 2010 to October 2010, Cahill and Reamer went to Fogarty's house in Belleville, Illinois, on numerous occasions to deliver drugs.   On several of these occasions, Cahill observed several white males at Fogarty's residence.   Reamer referred to the white males as "officials."   Cahill did not know the individuals, but Reamer identified one as Judge Cook and one as an individual known as "Christ."

6.      Your Affiant queried public records and confirmed that on February 8, 2011, Cahill pled guilty to a felony DUI charge and was sentenced by Judge Cook to 24 months' probation and three months' intensive probation.   Cahill also received 51 days credit for time served.   Your Affiant also confirmed through public records that on February 19, 2008, Cahill was arrested for a DUI.   On March 18, 2008, Judge Cook set the case for a bench trial.   A further review of the records showed the matter was continued 10 times (by multiple judges to include Judge Cook in consolidation with other charges) before Cahill was found guilty on August 4, 2010.   Your Affiant also queried public records and confirmed that Michael N. Cook (a 43 year

old white male) is a St. Clair County Circuit Court Judge and that James K. Fogarty (a 45 year old white male) is a St. Clair County Probation Officer.

7.     Beginning in June, 2012, and continuing thereafter, your Affiant interviewed Cooperating Individual #1 (hereinafter referred to as CI#1). CI#1, a self-admitted former drug user, originally came to law enforcement and provided the information as detailed herein. CI#1 has not been paid, has not been charged with a crime, and is not currently under investigation. CI#1 told your Affiant that CI#1 has seen Judge Cook use cocaine "hundreds of times." CI#1 has also known Judge Cook to smoke marijuana and abuse prescription pain medication such as Vicodin or Darvoset.   CI#1 has seen Judge Cook abuse prescription medications on approximately 50 to 60 separate occasions. CI#1 also witnessed Judge Cook use crack cocaine and marijuana multiple times. CI#1 claimed Judge Cook has been using drugs for the past 10 years.

8.     CI#1 went on to state that Tom Lee, a self-employed plumber from Belleville, Illinois is friends with Judge Cook. Lee provided Judge Cook with heroin that Lee obtained from Sean D. McGilvery, a heroin and cocaine distributor who lived at 112 South 35th Street in Belleville, Illinois. CI#1 detailed the ways in which Lee acquired heroin from McGilvery. Lee told CI#1 that on one occasion Judge Cook went with Lee to get cocaine from McGilvery. Lee also stated that in the summer of 2012, one week before leaving for vacation in Hawaii, Judge Cook had 12 grams of heroin in his possession. Lee told CI#1 that while Judge Cook was in Hawaii, Judge Cook met a "dirty doctor" from California who prescribed Percocet to Judge Cook. Lee also provided additional details of Judge Cook's prescription drug abuse.

9.     CI#1 continued, saying CI#1 knew through conversations with Lee that Judge Cook eventually started obtaining heroin directly from McGilvery, as opposed to using Lee.

4

Judge Cook received cocaine from McGilvery in early 2012. Judge Cook met with McGilvery or possibly another person three or four times a week to get drugs. Judge Cook would only acquire heroin from McGilvery. Judge Cook and McGilvery have had a "user's relationship" for the past eight years. CI#1 believes Judge Cook has been getting more than an "8 ball" (an eighth of an ounce) up to a fourth of an ounce of heroin from McGilvery each time. Judge Cook used heroin at Lee's home four times a week and had access to Lee's home with a key Lee provided Judge Cook.

10.    In June, 2012, CI#1 witnessed Judge Cook ingest a line of heroin and a line of cocaine by snorting both substances. In July, 2012, CI#1 witnessed Judge Cook crushing up Xanax and mixing it with heroin and then ingesting the heroin mixture.

11.    CI#1 provided Judge Cook's cellular telephone number as 618-954-1016.

12.    CI#1 was aware Judge Cook was friends with Joe Christ, who CS#1 later learned was an Assistant State's Attorney in St. Clair County, Illinois. CI#1 told your Affiant that Christ was a cocaine user, ingesting the drug by snorting it.

13.    Your Affiant queried an internet fee for service database which indicated cellular telephone number 618-954-1016 was subscribed to and/or used by Judge Cook. Your Affiant queried public records and confirmed that Joseph D. Christ (a 49 year old white male at the time of his death on March 10, 2013) was a St. Clair County Assistant State's Attorney prior to being sworn in as a St. Clair County Associate Circuit Judge. Your Affiant confirmed through public records that Thomas M. Lee Plumbing & Heating is located at 3124 West Main Street in Belleville, Illinois, which was consistent with information previously provided by CI#1.

14.    On November 29, 2012, your Affiant interviewed Cooperating Individual #2 (hereinafter referred to as CI#2), a witness who requested to remain anonymous at the time of the

5

interview. CI#2 is a self-admitted former drug user. During the interview, CI#2 provided information which was later corroborated by another witness, Deborah A. Perkins. CI#2 told your Affiant that CI#2 once lived with Perkins, a heroin distributor involved in the distribution of the drug with McGilvery. For that reason, CI#2 was familiar with Perkins and McGilvery's heroin distribution methods. CI#2 told your Affiant that since 2010 McGilvery had been supplied heroin by Perkins a "few times." McGilvery did not sell heroin out of his home, but met with individuals at local stores to conduct the drug transactions. McGilvery would generally meet individuals at his house if they wanted to purchase large amounts of heroin such as 20 grams or more. McGilvery was also using, selling, and trading cocaine, crack cocaine, and prescription pills such as Xanax and methadone. In 2012, McGilvery overdosed and spent some time in the hospital.

15.      On January 21, 2013, Agents of the Metropolitan Enforcement Group of Southwestern Illinois (MEGSI) and the Drug Enforcement Administration (DEA) executed a search warrant at the home of Perkins and Douglas W. Oliver located at 20 Kassing Drive, Fairview Heights, Illinois. The home at 20 Kassing Drive had been involved in numerous heroin related activities documented by the Fairview Heights Police Department dating back to 1999. In the spring and summer of 2012, two individuals died from suspected heroin overdoses at the residence. On September 5, 2012, Perkins and Oliver were arrested and ultimately charged with Concealment of a Death. On October 31, 2012, an Assignment Order was filed in the Perkins matter, transferring the case to Judge Cook. As Perkins and Oliver were co-defendants in the concealment case, your Affiant believes the Oliver case was also transferred to Judge Cook.

16.      During the execution of the search warrant, McGilvery arrived at 20 Kassing Drive. McGilvery was taken into custody and transported to the Fairview Heights Police

6

Department.   When asked by your Affiant if McGilvery would provide a statement to law enforcement, McGilvery advised he wished to consult an attorney.   McGilvery also advised he would contact your Affiant later that day or by the next day.

17.     On February 8, 2013, Deborah A. Perkins (a 65 year old black female) was interviewed pursuant to a proffer agreement in the presence of her attorney.   Perkins, a convicted felon, told your Affiant that she knew McGilvery had been using and selling heroin since 2005. In February, 2008, Perkins and McGilvery began going to Chicago once a week to purchase heroin.   Perkins estimated she and McGilvery made in excess of twenty trips to Chicago to acquire heroin, obtaining up to twenty-five grams per trip.   Perkins and McGilvery were supposed to be "business partners."   When Perkins and McGilvery returned from Chicago, Perkins would always give McGilvery all of the heroin they acquired.   Perkins and McGilvery "parted ways" between September 2008 and April 2009.

18.     Perkins also stated that beginning in the summer of 2009 and continuing until the summer of 2010, she began to travel to Chicago on a weekly basis to acquire heroin.   Perkins would generally travel to Chicago alone, but on two of those occasions McGilvery accompanied Perkins.   Perkins and McGilvery would pool their money with which to purchase the heroin. During that year, McGilvery gave Perkins money to purchase anywhere from twenty-five grams to one hundred grams of heroin each time Perkins went to Chicago.   While Perkins was taking trips to Chicago, McGilvery handled the "business aspects" of their partnership.   McGilvery went to Chicago alone one time and purchased twenty-five grams of heroin.   Sometime around Thanksgiving 2011, Perkins and McGilvery's business relationship changed in that they stopped pooling their money.

19.     Perkins continued, telling your Affiant that between Thanksgiving of 2011 and January 21, 2013, McGilvery would give Perkins between $2,500.00 and $5,000.00 every two weeks for Perkins to take to Chicago to purchase heroin. Several times Perkins received $3,500.00 from McGilvery. Perkins would acquire the heroin in Chicago and transport it to Fairview Heights, where McGilvery picked it up from Perkins. Perkins believed McGilvery quit selling heroin directly to customers seven or eight months ago. Still, McGilvery distributed heroin through an individual named Matt Heuer. In addition, every month for the past five or six years, Perkins and McGilvery have purchased a hundred methadone pills from a friend of Perkins. Perkins kept 50 pills for herself and gave the remaining 50 pills to McGilvery.

20.     Perkins further advised your Affiant she never knew McGilvery's customers, but knew McGilvery was selling heroin to a "professional person" who worked at the St. Clair County courthouse. Perkins did not know the name of the person from the courthouse to whom McGilvery was selling heroin, but believed the person was a white male and who was also an attorney. On one occasion, Perkins asked McGilvery to talk to "his boy" at the courthouse to see what was going on with Perkins' pending criminal charge for concealment of a death. Perkins was told by McGilvery that "his boy" informed him that St. Clair County had so many murders, approximately 69 to 80, that it did not have enough money to "try" them all and that Perkins did not have to worry.

21.     Perkins went on to say that possibly in the summer of 2011, she went with McGilvery while McGilvery "served" a white male in his forties with at least a gram of heroin. The house they went to was located in Belleville, Illinois and had a swimming pool in the backyard.

8

22.     Your Affiant is aware that Judge Cook lives at 1817 10th Fairway Drive in Belleville, Illinois.  Judge Cook's residence also has a swimming pool in the backyard.  Your Affiant also confirmed with MEGSI SA Aaron Nyman that a MEGSI investigation revealed Perkins was traveling to Chicago to acquire heroin.

23.     On February 14, 2013, Douglas W. Oliver (a 47 year old black male) was interviewed pursuant to a proffer agreement in the presence of his attorney.  Oliver, a convicted felon, is the son of Perkins and knew McGilvery.  Oliver also believed based on conversations with McGilvery that McGilvery knew someone in the State's Attorney's Office along with other officials who could provide McGilvery information on Oliver's pending criminal charge for concealment of a death.  McGilvery told Oliver not to worry about his case because it was only a "probationable" matter and that Oliver would not be looking at serving a lot of time.

24.     Oliver continued, saying sometime in March or April of 2012, Oliver asked McGilvery to get rid of 10 grams of heroin because Oliver was on probation and did not want to get in trouble.  McGilvery gave Oliver $1,000.00 for the heroin.  Within the two months prior to his interview, Oliver also provided methadone pills to McGilvery on three separate occasions.  Oliver provided 30 pills per month to McGilvery.  Oliver would then be paid by McGilvery for the pills.

25.     On March 4, 2013, due to the fact that McGilvery and/or his attorney never contacted your Affiant, FBI SA Nicholas J. Manns and your Affiant made contact with McGilvery at his current residence (309 North 38th Street, Belleville, Illinois).  During the contact, McGilvery stated he spoke with an attorney who advised him not to talk to the FBI.  McGilvery never retained the attorney, but followed the attorney's advice and did not contact the FBI.  During the contact, McGilvery provided his cellular telephone number as 618-806-0305,

saying he has had the telephone number "for years."   McGilvery indicated he wished to cooperate with the FBI and would contact an attorney by that Wednesday after which McGilvery or his attorney would likely be in contact with your Affiant.

26.     On March 11, 2013, AT&T provided subscriber information and toll records for 618-806-0305 for the time period March 10, 2012 to March 10, 2013, pursuant to an authorized subpoena.  AT&T advised that the subscriber information for 618-806-0305 is Linda Gibson of 112   South   35th   Street,   Belleville,   Illinois   with   a   home   e-mail   address   of SEANDON007.SM14@GMAIL.COM.   Your Affiant is aware that Gibson is McGilvery's mother, who currently lives at 309 North 38th Street in Belleville, Illinois.  Your Affiant also knows Gibson utilizes a different cellular telephone number.

27.     A review of the historic records showed more than 2,000 telephone calls and/or other electronic communications, to and from cellular telephone number 618-806-0305 (previously identified as the cellular telephone number for McGilvery) and to and from cellular telephone number 618-954-1016 (previously identified as the cellular telephone number for Judge Cook) from March 10, 2012 to March 9, 2013.  Moreover, the records showed cellular telephone number 618-806-0305 (associated with McGilvery) contacting cellular telephone number 618-954-1016 (associated with Judge Cook) within minutes of your Affiant and SA Manns leaving the contact with McGilvery on March 4, 2013.

28.     On Sunday, March 10, 2013, former Assistant State's Attorney and newly appointed St. Clair County Associate Circuit Judge Joseph D. Christ (previously mentioned) died during a hunting trip with Judge Cook in Pike County, Illinois.  Christ was 49 years old at the time of his death.  The investigation of Christ's death was conducted by the Pike County Sheriff's Department.  During the investigation, on March 15, 2013, Pike County Sheriff (and

Coroner) Paul F. Petty met and spoke with Judge Cook at a restaurant in Belleville, Illinois. During the conversation, when asked about prior cocaine use, Judge Cook ultimately admitted using in the past, claiming he started his drug use after the death of a sibling. Judge Cook further admitted he used cocaine the day prior to Christ's death, after Christ brought it out as the two drove to their hunting trip in Pike County. An autopsy was performed on Christ to determine the cause of death. Your Affiant reviewed a Report of Postmortem Examination (case number N-13-153) prepared by the Pike County Coroner's Office and which indicated the cause of death for Christ as being "cocaine intoxication."

29.     In reviewing the aforementioned AT&T records, your Affiant determined that cellular telephone number 618-954-1016 (associated with Judge Cook) contacted cellular telephone number 618-806-0305 (associated with McGilvery) on March 8, 2013 at 10:33 a.m. and at 5:17 p.m. Furthermore, cellular telephone number 618-806-0305 (associated with McGilvery) contacted cellular telephone number 618-954-1016 (associated with Judge Cook) on March 9, 2013 at 8:49 a.m.

30.     On January 19, 2013, MEGSI SA Nyman obtained a search warrant on Perkins' home (previously mentioned) which was signed by St. Clair County Associate Circuit Judge Randall W. Kelley. AT&T records acquired by your Affiant indicated telephone number 618-447-6579 had multiple contacts with cellular telephone number 618-806-0305 (associated with McGilvery) on January 20, 2013 and January 29, 2013. Your Affiant is aware that telephone number 618-447-6579 was a cellular telephone number utilized by Christ.

31.     A review of AT&T records by your Affiant showed more than 130 telephone calls and/or electronic communications, to and from cellular telephone number 618-806-0305

11

(associated with McGilvery) and to and from cellular telephone number 618-954-1016 (associated with Judge Cook) from April 6, 2013 to May 6, 2013.

32.     On March 27, 2013, your Affiant drove by Judge Cook's residence (1817 10th Fairway Drive, Belleville, Illinois – previously referenced).   While driving by, your Affiant observed a Maroon Ford Explorer Sport Trac bearing Illinois license plate L532957.   Your Affiant also observed a camouflage pattern luggage rack on the roof of the vehicle.  Your Affiant later caused a computerized check of Illinois license plate L532957 and learned it was to be displayed on a 2007 Ford carryall registered to Mike and Kori Cook of 1817 10th Fairway Drive, Belleville, Illinois.   The computerized check also revealed the vehicle identification number (VIN) as 1FMEU53K27UA56640.

33.     On April 16, April 19, April 23, and April 25, 2013, at your Affiant's request, Illinois State Police (ISP) Master Sergeant (MSgt.) Joe Beliveau and other MEGSI Agents conducted physical surveillance of Judge Cook, McGilvery, and/or their aforementioned residences, 1817 10th Fairway Drive and 309 North 38th Street, in Belleville.  MSgt. Beliveau and the MEGSI Agents are familiar with Judge Cook.  On each occasion, Judge Cook was observed in his vehicle, the aforementioned Maroon Ford Explorer Sport Trac, arriving at McGilvery's residence, exiting his vehicle, and entering McGilvery's residence using a door located on the south side of the residence, as opposed to using the front door located on the east side of the residence.  After a short period of time, ranging from approximately three to twenty-nine minutes, Judge Cook was observed exiting the south door of the residence, walking to his vehicle, entering it, and leaving.  On one occasion, Judge Cook was followed to his place of employment, the St. Clair County Courthouse in Belleville.

34.     On April 25, 2013, United States Magistrate Judge Stephen Williams signed a warrant (case number 13-mj-7039) authorizing the activation and monitoring of a Global Positioning System (GPS) tracking device for the aforementioned Sport Trac.  The activation of the GPS tracking device allowed your Affiant to monitor the movement and physical location of the GPS device.  In reviewing the data captured by the GPS tracking device for April 26, 2013 to May 13, 2013, your Affiant determined the aforementioned Sport Trac was in the vicinity of McGilvery's residence, located at 309 North 38th Street in Belleville, on April 26, April 27, April 28, April 29, April 30, May 1, May 2, May 4, May 6, May 8, May 9 (on two separate occasions), May 10, May 12, and May 13, 2013.

35.     In addition to the surveillance conducted by MEGSI, between April 26, 2013 and May 13, 2013, through additional law enforcement surveillance on McGilvery's residence, located at 309 North 38th Street in Belleville, your Affiant confirmed Judge Cook's physical presence at McGilvery's residence on April 26, April 27, April 28, April 29, May 1, May 6, May 8, May 10, May 12, and May 13, 2013.  On each occasion, Judge Cook was observed arriving at McGilvery's residence, exiting his vehicle, and entering the south door of the residence.  After a short period of time (rarely exceeding 10 minutes, but never exceeding 30 minutes) Judge Cook was observed exiting McGilvery's residence and leaving.  Judge Cook was always observed driving the aforementioned Sport Trac to and from McGilvery's residence.

## INVESTIGATION OF OTHER JUDICIAL PROCEEDINGS

36.     Your Affiant reviewed public records from the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois and found that on December 5, 2011 McGilvery was charged with Unlawful Possession of a Controlled Substance (case number 11-CF-0176901).  On April 16, 2012, an Order was entered placing McGilvery in "Drug School," (a drug diversion

program) and resetting the case for review on May 30, 2012.  On May 29, 2012, an Order was signed by Judge Cook, dismissing the Unlawful Possession of a Controlled Substance charge previously filed against McGilvery "upon successful completion of TASC's State's Attorney's drug abuse program...."  The same order was initialed "JDC" which your Affiant learned belonged to Christ, who was an Assistant State's Attorney at the time.  Your Affiant confirmed McGilvery did successfully complete the Drug School program offered by TASC (Treatment Alternatives to Street Crime).  At the time of the dismissal, however, the case was not assigned to Judge Cook's docket, nor was it assigned to Christ as the prosecutor.  It should be noted a condition of enrollment in the Drug School program, along with the terms of the ultimate dismissal, prohibited McGilvery from violating "any penal laws of the United States, of the State of Illinois, or municipality therein during the pendency period of the above cited case...."  A review of AT&T records by your Affiant showed 130 telephone calls and/or electronic communications, to and from cellular telephone number 618-806-0305 (associated with McGilvery) and to and from cellular telephone number 618-954-1016 (associated with Judge Cook) during the month of May, 2012.

37.     Your Affiant also reviewed public records from the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois and found that on February 11, 2013, McGilvery was arrested for No Valid Driver's License (case number 13-TR-5242) and "Operation of a Vehicle with Expired Registration Plates" (case number 13-TR-5243).  On February 26, 2013 (the day prior to Christ being sworn in as an Associate Circuit Judge), a dismissal order drafted and initialed by Christ (as an Assistant State's Attorney) was signed by Judge Cook, dismissing the above-mentioned cases.  Your Affiant reviewed the Order, which read, "defendant is in compliance w/both tickets."  Your Affiant has also learned that neither Christ, nor Judge Cook,

was assigned any traffic cases at that time. Moreover, the above-mentioned cases were not set for initial appearance until March 13, 2013.

38.     Your Affiant also reviewed public records from the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois and found that on September 5, 2012, Perkins and Oliver were arrested and ultimately charged with Concealment of a Death (previously mentioned). On October 31, 2012, an Assignment Order (case number 12-CF-01263) was filed in the Perkins matter, transferring the case to Judge Cook. As Perkins and Oliver were co-defendants in the concealment case, your Affiant believes the Oliver case (case number 12-CF-01261) was also transferred to Judge Cook.

## ILLEGAL DRUGS AND RELATED RECORDS AND PARAPHERNALIA

39.     As a result of your Affiant's training and experience, along with the training and experience of various other investigators assisting your Affiant in this investigation, your Affiant is familiar with how various drugs are used, produced, and/or manufactured and the typical distribution and trafficking methods used by drug users, dealers, distributors, and manufacturers (collectively referred to as drug traffickers). In addition, your Affiant is also familiar with the numerous documents and records generated and the paraphernalia used during and/or associated with the distribution, manufacturing, and trafficking of these controlled substances. Your Affiant's awareness of these drug trafficking practices, as well as her knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from your Affiant's training and involvement in prior drug investigations, as well as information provided to your Affiant by other law enforcement officers when relating their own experience and results of their numerous drug investigations.

Based on this training and experience, your Affiant knows that:

40.     As in this case, illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale, and similarly such drug traffickers will have an "inventory" which will fluctuate in size depending upon the demand for the product. In the same respect, much as any distributor of a commodity, drug traffickers will also have a cash "inventory," or amount of United States Currency, which will also fluctuate in size depending upon the sale of the product.

41.     In addition to controlled substances, it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities, even though such documents may be in code. These records are generally kept for a period of time extending beyond the time during which the drug trafficker actually possesses the controlled substances, in order to maintain contact with clients, customers, associates, suppliers, and others involved in their drug trafficking activities, and to ensure future success in the business. In some instances, these drug-related notations and records are maintained electronically, for example, on cellular telephones, computers and computer storage devices such as disks or flash drives, electronic organizers/address books, telephone answering/recording machines, telephone beeper/pager equipment, and telephone caller ID boxes. It has been your Affiant's experience that many such records will be kept close at hand, often at the drug trafficker's residence or stash house, so that the records are readily accessible in order to facilitate the drug trafficking business.

42.     Because drug traffickers in many instances will "front" (that is, sell on consignment) these controlled substances, some form of record-keeping is necessary to keep track of amounts paid and owed. Such records will also be maintained close at hand so as to

readily ascertain current balances. Often drug traffickers keep "pay and owe" records, or ledgers, to show balances due for drugs sold in the past ("pay") and for payments expected ("owe"). These records are commonly kept for extended periods of time, much the same as a legitimate business might keep records of purchases and suppliers and accounts payable or receivable.

43.     Drug traffickers very often place assets in names other than their own, and maintain residences in names other than their own to avoid detection of them and/or their assets by law enforcement agencies. Even though those residences and/or assets are in other person's names, the drug traffickers continue to use them and exercise dominion and control over them. Drug traffickers will frequently keep and maintain documents indicating ownership or providing descriptions of these assets.

44.     During the course of drug related searches, your Affiant and other agents have found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, videotapes, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

45.     It is also a common practice for drug traffickers to conceal at their residences, offices, garages, storage buildings, automobiles, safety deposit boxes, and/or on their persons, large sums of money (generally United States Currency), either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers frequently keep on hand quantities of currency in order to maintain and finance their ongoing narcotics business. In this connection, drug traffickers often make use of wire transfers, cashiers' checks, and money orders

to further their drug enterprises.  Evidence of such financial transactions, as well as records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be kept for an extended period of time.  Drug traffickers often keep the large sums of currency close at hand, often at the location in which they reside, to oversee and protect the currency from detection and/or theft.

46.  To your Affiant's knowledge, heroin is not manufactured or cultivated within the Southern District of Illinois.  As a result, as in this case, individuals involved in the use, distribution, and trafficking of heroin must frequently travel outside of the Southern District of Illinois to obtain the drugs.  Consequently, traffickers of heroin must themselves travel (or pay and arrange for others to travel on their behalf) to or from "source countries," "source states," and/or "source cities," where large reserves of heroin are frequently smuggled and stored.  Such travel necessarily results in the generation of various travel documents for the traveler, such as gas receipts, airline, train or bus tickets, boarding passes, travel itineraries, hotel receipts, credit card receipts, maps, telephone records, written directions, GPS data, or other items detailing routes utilized during these trips.

47.  Drug traffickers frequently take, or cause to be taken, photographs and/or videotapes of themselves, their associates, and their property, which they will keep under their control over long periods of time.

48.  In addition to the aforementioned records, it is also a common practice for drug traffickers to maintain items of value, drug paraphernalia, and items necessary to use, distribute, and/or produce a distributable product.  Like drug related records, these items are often kept on a continuous basis for a period of time extending beyond the time which the drug trafficker

18

actually possesses the controlled substances.  This is done to increase efficiency and ensure future success of the drug trafficking business.

49.    Drug traffickers often deal/possess firearms and other weapons, goods, and/or items of value, to include precious metals and jewelry, and exchange drugs for such items. Often, these same items are stolen.

50.    Typically, drug traffickers possess firearms, ammunition, and other dangerous weapons to protect their profits, supply of drugs, and persons from competitors and others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

51.    Because drug traffickers occasionally use their own product and/or allow others to use the product in their presence and because they frequently employ users of the drug to assist them in their drug trafficking activities, paraphernalia for drug use/abuse are often kept by the drug trafficker on a continuous basis and kept close at hand for use whenever needed.  This paraphernalia includes various types of pipes, syringes, razor blades, straws or "snorting tubes," spoons, mirrors, rolling papers, and other such drug paraphernalia.  In addition, it is common for such drug users to go through periods of rehabilitation which often require the use of legal substances to assist in mitigating the withdrawal effects of their addiction.  As in this case, heroin users/addicts often use various forms of methadone in this process.  Many go to methadone clinics for such treatment, wherein the patients receive specific doses of the drug.  In other cases, your Affiant is aware that users often acquire additional methadone from such clinics for later use, as well as through unlawful distributors of the substance.

19

52.     Powder drugs such as heroin are often produced in a high purity form, but rarely consumed by users or distributed by dealers in such high purity form.  Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level after being mixed with other substances to provide a more manageable dosage unit.  Moreover, powder drugs such as heroin are extensively mixed or "cut" with a variety of substances and/or diluents in order to make it appear that there is a larger amount of the drug than is actually present, thereby increasing the drug trafficker's profit.  High purity powder drugs are reduced in purity by the addition of diluents such as dietary supplements, Dormin (a sleep-aid pill), laxatives, vitamin B12, baking powder, crushed Tylenol, powdered milk, baking soda, sugar and other such diluents.  This process is called "cutting" or "stepping on" the drug.  Other equipment, such as glassware, scales, sifters, grinders, razor blades, glass panes and mirrors, and the like are typically used in this cutting process.

53.     Once the drug has been cut, a usual practice is to weigh the product and repackage it in smaller quantities in plastic bags, balloons, heat-sealed bags, and/or other types of containers for redistribution.  Scales are used to weigh the product purchased and/or sold.

54.     In an attempt to protect their business, product, and profits from discovery by law enforcement and/or from individuals who would attempt to take, rob, or steal these items, drug traffickers frequently utilize detection devices, such as police scanners, two way radios, motion detectors, video and audio surveillance equipment, and other such items.  These items are also kept and operated on a continuous basis.

55.     In a number of searches in prior investigations that your Affiant and/or her fellow investigators have been involved in, these enumerated types of evidence have typically been

20

recovered from the main residence and in addition, from other structures and areas on the property being searched, for example, detached garages, other storage lockers/areas, detached closets, containers, automobiles, computers, electronic storage devices, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence, as well as from the persons of occupants or individuals located within.

56.     In a substantial number of searches executed in connection with the drug investigations in which your Affiant and/or her fellow investigators have been involved, or informed of, the items listed in Attachment A have been recovered.


57.     It is further requested that the Court order that all papers in support of this application, including the Affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

FURTHER AFFIANT SAITH NAUGHT


Julie E. Neiger
Special Agent
Federal Bureau of Investigation


STEPHEN R. WIGGINTON
United States Attorney


James L. Porter
First Assistant United States Attorney

21

State of Illinois        )
                         ) SS.
County of St. Clair   )

    Sworn to before me, and subscribed in my presence on the ___15TH___ day of May, 2013, at East St. Louis, Illinois.

                          Clifford J. Proud
                          United States Magistrate Judge

# ATTACHMENT A

a)   Controlled substances (including heroin, synthetic opioids such as methadone, and any other illegal controlled substances);

b)   Paraphernalia for packaging, processing, diluting, weighing, manufacturing, and distributing controlled substances, such as plastic bags, heat sources, scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, heat-sealing devices, filters, and diluents such as dietary supplements, Dormin (a sleep-aid pill), laxatives, vitamin B12, baking powder, crushed Tylenol, powdered milk, baking soda, sugar and other such diluents;

c)   Paraphernalia for the use of controlled substances, such as pipes, syringes, razor blades, straws or "snorting tubes," rolling papers, and other such drug paraphernalia items;

d)   Books, records, receipts, notes, letters, ledgers, and other papers, as well as electronically stored data, related to the use, distribution, or transportation of controlled substances;

e)   Personal books, papers, or electronically stored data (to include data stored on cellular telephones, computers and storage devices such as disks or flash drives, GPS devices, electronic organizers/address books, telephone answering/recording machines, telephone beeper/pager equipment, and telephone caller ID boxes) reflecting names, addresses, telephone numbers, and other contact or identification data relating to the use, distribution, or transportation of controlled substances;

f)   Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, videotapes, personal telephone, storage building receipts, post office box receipts, books, diaries, utility and telephone bills, statements, identification documents, and keys;

g)   Cash, currency, financial instruments, precious metals, jewelry, and other items of value which were furnished or intended to be furnished in exchange for a controlled substance, or which constitute proceeds of trafficking in a controlled substance, or which were used or intended to be used to facilitate a violation of the Controlled Substances Act;

h)   Records relating to controlled substances income and expenditures of money and wealth, to-wit:  money orders, wire transfers, cashiers' checks and receipts, safety deposit box receipts, bank statements, passbooks, checkbooks, and check registers;

i)   Documents indicating travel to and from "source countries," "source states," and/or "source cities," such as gas receipts, maps, written directions, GPS data, travel itineraries, plane, bus and/or train tickets, boarding passes, motel/hotel receipts, passports and visas, credit card receipts, telephone bills, as well as photographs and videotapes taken or produced during the travel;

j)   Photographs and videotapes of the drug traffickers, their associates, and their property;

k)   Firearms (including magazines) and other dangerous weapons and/or ammunition;

l)   Detection devices, such as police scanners, two way radios, motion detectors, video and audio surveillance equipment, and other devices used for the same purpose; and

m)   Safes, vaults, strong boxes, or any other such items that may contain any of the aforementioned items.